FILED

2014 JAN 10  AM 10: 39

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1   Francis I. Spagnoletti, Esq.
    Email: fspagnoletti@spaglaw.com
2   (Admitted *pro hac vice*)
    David S. Toy, Esq.
3   Email: dtoy@spaglaw.com
    CA SBN 168368
4   Marc E. Kutner, Esq.
    Email: mkutner@spaglaw.com
5   (Admitted *pro hac vice*)
    Spagnoletti & Co.
6   401 Louisiana Street, 8th Floor
    Houston, TX 77002
7   Telephone:  713 653 5600
    Facsimile:   713 653 5656
8

9   Attorneys for Plaintiffs,
    Patricia Sandoval and Nicholas Taliaferro

10

11           UNITED STATES DISTRICT COURT

12           CENTRAL DISTRICT OF CALIFORNIA

13

14   PATRICIA SANDOVAL, an     )   Case No. CV12-5517-GW (SHx)
    individual, and NICHOLAS     )
15   TALIAFERRO, an individual,     )
                       )
16           Plaintiffs,       )
                       )
17       vs.             )
                       )
18   CARNIVAL CORPORATION, a   )
    Panamanian corporation, MICKY  )
19   ARISON, an individual, HOWARD  )
    S. FRANK, an individual, ARNOLD  )   **THIRD AMENDED COMPLAINT**
20   W. DONALD, an individual,     )
    JOSEPH FARCUS, an individual,  )
21   JOSEPH FARCUS, ARCHITECT,  )
    P.A., a professional association   )
22   JOHN DOES 02 through 05,     )
    individuals, and JOHN DOE     )
23   CORPORATIONS 07 through 10,   )
    corporations,            )
24           Defendants.     )

BY FAX

25

26       Plaintiffs Patricia Sandoval and Nicholas Taliaferro ("Plaintiffs"), by and

27   through undersigned counsel, bring this action against Defendant Carnival

28

                            1

Corporation, and, as ordered to do on December 31, 2013 (D.E. 138), file this, their Third Amended Complaint, and would respectfully show as follows:

This Third Amended Complaint states claims for negligence and gross negligence, among other things, and seeks actual and punitive damages in excess of the jurisdictional minimum of this Court, exclusive of interest, costs, and attorneys' fees.

## I. PARTIES

1.1    Plaintiffs are United States citizens and residents of the State of California.

1.2    Defendant Carnival Corporation is a Panamanian corporation, registered to do business in the state of Florida, with its principal place of business in Miami, Florida, but which will do business in California as Carnival Cruise Lines ("Carnival").  Carnival has generally appeared in this action by answer.

## II. JURISDICTION

2.1    This is an admiralty and maritime claim within this Court's original jurisdiction pursuant to 28 U.S.C. sections 1331 and 1333, and brought pursuant to the General Maritime Law of the United States, as supplemented by Italian law.

2.2    This Court has general jurisdiction over Carnival due to its general appearance, and by virtue of its substantial, continuous and systematic contacts with and in the State of California. Alternatively, this Court has specific jurisdiction over Carnival in that it has purposefully availed itself of the benefits and protections of the laws of the State, this cause of action relates to or arises in part out of Carnival's contacts with the State, and the exercise of personal jurisdiction over Carnival will comport with fair play and substantial justice.

## III. VENUE

3.1    Venue is proper in this Court because Carnival is subject to jurisdiction in this District pursuant to 28 U.S.C. § 1391.

3.2     This forum is proper, and not subject to contractual limitation or forum requirements which, among other things, are void, voidable, and/or unenforceable pursuant to Italian law, and for which, if any, there is a failure of consideration.

## IV.  FACTS

4.1     The foregoing paragraphs are re-alleged as though fully again set forth.

4.2      On or about January 13, 2012, Plaintiffs Patricia Sandoval and Nicholas Taliaferro were passengers on the  MS *Costa Concordia* (the "Vessel"), when the Vessel's captain took it off its intended course to pass closely by the Isola del Giglio as a "salute" to its inhabitants.

4.3     This was a grave error.  The Vessel suddenly and without warning struck a rock, and eventually capsized.

4.4.     Immediately after the allision, chaos and terror ensued on the Vessel as its passengers and crew, including Plaintiffs, rushed to evacuate as the Vessel listed the vessel in dark and freezing waters.

4.5.     During the allision, and during and after the evacuation, Plaintiffs clearly in the zone of danger, suffered physical and emotional injuries, and continue to suffer these physical and emotional injuries.

4.6     This tragic allision, as Carnival admits, was the result of human error, which error resulted from the failure of Carnival to have a proper bridge management policy and manual, and to implement proper safety management systems and protocols which it developed and promulgated for adoption by and imposition on the cruise lines which make up Carnival's brands.  Carnival's failures in this instance are the result of its own negligence, and not any derivative or vicarious negligence of any of its brands, but its own direct negligence  predicated on its own breach of duty to these Plaintiffs which was the cause of their damages.

4.7     Carnival formed and operates a Health, Environmental, Safety & Security ("HESS") Committee, the focal point for supervising and monitoring the health,

environmental, and safety and security policies and programs both at sea and onshore, in compliance with health, environmental, safety, security, legal and regulatory requirements. The HESS mission is to conduct corporate assessment of Safety, Health and Security Management Systems at each Carnival company, including Costa Crociere, one of the several Carnival cruise line "brands," which assessments assist Carnival with ultimately implementing the safety policies and procedures and safety management system it creates for implementation and enforcement across its brands.

4.8     Carnival cannot escape liability for the *Concordia*. Carnival controls its cruise line brands not as a function of occupying a top spot on an organizational chart as a holding company, but because it assumed the duty and role of promulgating, mandating and enforcing specific policies and procedures, and actively requires its brands to implement those policies and procedures. As an example, Carnival undertook in 2009 to draft a Bridge Resource Management Manual ("BRMM"), as part of a larger Bridge Resource Management ("BRM") Policy, but failed to mandate and enforce the adoption of this BRM Policy, even though it mandated and enforced the adoption and implementation of other policies and procedures across its brands.

4.9     The BRM standard concentrated on hiring, training and assessment requirements of all deck officers and of its cruise line brands, including Costa Crociere. This standard, among others, was not a general policy, but a specific intervention by Carnival in the operation of the vessels of its subsidiaries and brands, including the Vessel. The acts undertaken by Carnival to set specific safety policies, such as the BRM Policy, were not gratuitously taken, nor did Carnival receive any consideration for doing so. Rather, these acts were undertaken as part of a duty assumed by Carnival. By creating, promulgating, and enforcing implementation of specific safety standards and policies for each of its brands, to be implemented and enforced on each of its brands' vessels, including by Costa Crociere for the MS *Costa Concordia*, Carnival assumed a duty to provide for the health and safety and of the

MS *Costa Concordia's* passengers.  This same duty was assumed by Carnival given its audit function which Carnival assumed and failed to properly carry out.

4.10   The responsibility for having and implementing a corporate BRM Policy across its brands, including Costa Crociere, was assumed by Carnival.  The failure to create an appropriate BRM Policy, in addition to other safety systems and policies, was a failure of Carnival, which makes its decisions from Carnival's offices in Miami, Florida.  It also failed to implement those BRM and other policies which were created by Carnival.

4.11   The BRM Policy that would have prevented the human error that resulted in this tragedy existed well before the Vessel struck a rock and sank, but had not been implemented.  Had this BRM policy been in place at the time of the Vessel's tragedy, the death of some of the Vessel's passengers, and injuries of many, including Plaintiffs, could have been avoided.  However, Carnival did not implement this policy before the tragedy, yet it had the right, power and authority to do so.  Indeed, Carnival admits this failure.  The failure to implement and enforce this BRM Policy was compounded by Carnival's further failure to  promulgate, draft, implement and enforce other safety policies, which failure further contributed to the deaths of some of the Vessel's passengers, and injuries to others, including Plaintiffs.

4.12   Carnival has stated, and Plaintiffs agree, that the cause of this tragic accident was human error.  This error occurred on the bridge of the Vessel as part of her navigation, an error fostered and allowed by a corporate and bridge management culture which did not encourage "thinking aloud," *i.e.*, actively questioning the Vessel's pilot/captain about his intentions, and the probable outcome of actions furthering those intentions, like, for example, steering a huge vessel off its planned course and into a rock.  This human error was a cause of this accident, but the cause of this human error was Carnival's negligence in not having a proper BRM Policy or

manual, among other failures in the specific safety policies and systems that governed the operations of the Vessel.

4.13   The BRM Policy that would have prevented this accident existed well before the Vessel struck a rock and sank, but had not been implemented.   After having assumed, among other functions, the duty of promulgating, drafting, implementing and enforcing policies across its cruise line brands, including Costa Crociere, the failure to implement and enforce this BRM Policy allowed this human error to be made, leading to this tragedy for which Carnival is liable.   In addition to failing to implement and enforce this BRM Policy, Carnival also failed to promulgate, draft, implement and enforce other safety policies contributing to the injuries and deaths on the Vessel.

4.14   The BRM Policies in place at the time of the incident were inadequate to prevent the tragedy, and having a revised BRM Policy "on the drawing board" but not yet implemented greatly increased the risk of harm to Plaintiffs. Without question, the crew of the Vessel detrimentally relied on the inadequate policies allowed by Carnival.  They were moreover lulled into a false sense of security by relying upon entirely inadequate BRM standards created by Carnival in 2009, prior to the accident, a standard that Carnival now admits was insufficient at the time of the tragedy and was being re-written into a corporate Bridge Resource Management Manual for implementation across its cruise line brands, including Costa Crociere.

4.15   Carnival prepared and disseminated to its cruise brands a "final draft" of a corporate BRMM which Carnival was proposing for implementation across the corporation.   This same BRMM had been drafted in 2009, but had not been implemented by Carnival, because Carnival had not identified it as a good practice at that point to do it. But, had the BRM policy been in place at the time of this tragedy, Carnival has admitted "[i]t would have helped prevent the consequences" of the piloting error, "by people being willing to speak up."

4.16   The enhanced bridge management procedures embodied in this policy, and the training Carnival had a duty to implement but did not before this tragedy, would have likely prevented the human failings and errors that led to the tragedy because the procedures encourage all members of the bridge watch team to question things that they do not understand that are being given as orders or that raise concerns.

4.17   These procedures would have encouraged individual watchstanders to voice their opinions, and would have encouraged vessel captains to listen to those concerns, and in that way give captains and crews more tools to use at the conn to make correct decisions, or to correct incorrect decisions.

4.18   The previously drafted BRM policy that was near agreement prior to the incident now also concentrated on the hiring, training and assessment requirements of deck officers. This policy was also a specific corporate safety standard, not a standard unique to an operating line, but in fact was applicable to all deck officers and operating lines.

4.19   The original corporate policy was issued July 1, 2008, and was to be applicable to all ships in Carnival's cruise lines by July 1, 2011, well before the Vessel struck a rock on January 13, 2012.  The training identified by Carnival consisted of seven different elements, two of which related to bridge resource management, particularly training of procedures for normal operation ("BRM1"), and training of procedures for abnormal or emergency situations ("BRM2").  An assessment of the training is then required for all Masters and watch-standing Deck Officers.  The assessment addressed the validity of the training given to respond to risks including navigational safety incidents and near misses attributable to ineffective teamwork and situational awareness of bridge personnel.

4.20   The original version of this standard was issued on July 1, 2008.  On January 13, 2012, this tragedy occurred, over 3½ years after the standard was issued, and over 6 months after it was to have been applicable to "all ships."  This BRM

1    existed before the Concordia tragedy, but was only later revised to reflect, among
2    other things, the passing of the July 1, 2011, deadline to implement it as to all ships,
3    and to introduce the corporate BRMM.

4        4.21   Both the BRMM and other safety standards show Carnival, before this
5    tragedy, had in place and applicable to all brands, requirements for training officers
6    on all ships and across all brands.  In fact, Carnival was referencing certain corporate
7    safety standards for promoting masters on its cruise line vessels as of March 5, 2009,
8    which required these masters to meet a pre-determined, required level of training in
9    Bridge Team Management.

10       4.22   Carnival had a BRMM as far back as 2009, which, had it been
11   implemented, would have helped prevent this tragedy.  In addition, Carnival had in
12   place even before 2009 training requirements applicable to all deck officers and
13   operating lines, which included required training in Bridge Resource Management, in
14   particular training and assessment for navigational safety incidents and near misses
15   attributable to ineffective teamwork and situational awareness of bridge personnel.
16   Clearly Carnival undertook a duty to create these specific safety policies for
17   imposition across its cruise line brands, but failed to do so, or negligently did so,
18   leaving a BRM Policy "on the drawing board" which would have prevented this tragic
19   human error, which error caused the injuries and damages alleged.

20       4.23   After this tragedy, Carnival published itself in January 2013 a HESS
21   Regulatory Report, which stated outright "[b]ridge team management was a major
22   contributing factor to the accident."  This is a clear admission of the failure of
23   corporate-wide, safety policies, and the cause of the accident.  Carnival had in place
24   before the tragedy policies and requirements for training deck officers on navigation.
25   These training policies, developed by Carnival, even though they existed at the time
26   of this tragedy, had not been fully implemented, but if they had, they would have
27   likely prevented this tragedy.

28

4.24   Carnival's HESS reports state "bridge team management was a major contributing factor to the accident." Carnival was intimately involved with bridge team management from the standpoint of training, assessment and drafting the bridge policies and Bridge Resource Management Manual. Carnival identified, at a corporate level, training and procedures that would have helped prevent the accident. The failure to implement a bridge management system was a failure of Carnival to discharge a duty Defendants undertook and agreed to protect the health and safety of passengers and crew traveling on any ships within Carnival's cruise line brands.

4.25   In addition to this corporate BRM Policy, Carnival plainly and explicitly ordered all ships in its cruise line brands to follow Carnival's Ship Emergency Mustering and Ship Abandonment Doctrine, and further ordered that "[w]here conflict with other procedures exist these procedures are to be followed."

4.26   Well before this tragedy, Carnival was deeply involved in setting over 35 safety standards at a corporate level for its ships across the brands, including individual corporate safety standards identifying mandatory compliance requirements for the brands. These include for example a Bridge Team Management Training Standard (so-called "CSAFS 029"), which predated this tragedy, and the BRMM, which was drafted before the tragedy, but not implemented.

4.27   This level of involvement in the operation of its cruise ship brands, indeed the ships themselves, creates direct liability for Carnival for its own involvement in training and establishing bridge management and other safety policies. This liability is not derivative of the actions of Costa Crociere or the crew of the Vessel, but directly attributable to the actions and inactions of Carnival itself.

4.28   Carnival used its position as the head of the cruise line brands to command policies and adherence thereto across those brands, and exert a close control which subjects it to direct liability for the failure of the bridge management policies on its brands, including Costa Crociere.

4.29   Carnival's direct and close involvement in setting policies applicable to its  cruise ship brands, including policies related directly to the cause of this tragedy and the Plaintiffs' injuries (including bridge management, mustering and evacuation), specifically the requirement of particular Bridge Management Resources training program in place applicable to the brands <u>before</u> the incident, and a Bridge Resources Management Manual drafted but not implemented before the incident.

4.30   The failure to implement a bridge management system, was a failure of Carnival, who undertook that task and promulgated same as early as 2009.  This task unquestionably and admittedly was done to protect the health and safety of passengers traveling on any Carnival brand ships.  Carnival's breach of this type of specific operational duty gives rise to Carnival's liability for negligence.  In fact, the BRM implemented after the *Costa Concordia* tragedy is a very detailed policy which even provides an example of <u>what people on the bridge should say to one another</u> when "thinking aloud."

4.31   In addition to bridge management, Carnival directed evacuation safety on ships across its cruise line brands, issuing a directive in effect November 7, 2006, that "[a]ll ships <u>are to have</u> assigned secondary muster/assembly stations in the event of a main muster/assembly station being unable to be used.  In addition to being applicable to all ships in Carnival's cruise line brands, it was also referenced in a NTSB recommendation to vessel owners within the brands "[f]or the ships in <u>your fleets</u> . . . ."

4.32   Carnival however failed to promulgate, implement and enforce a proper corporate muster and evacuation policy across the brands, including for Costa Crociere, and this failure caused confusion, injury and damage to the crew and passengers of the Vessel, during the evacuation.

4.33   As firmly entrenched in these safety training and bridge management policies as it was, Carnival is indeed more like, if not actually an, owner *pro hac vice*,

1  or the operator, which  due to its operational and managerial control of its cruise line

2  brands, may properly be held liable for injuries which occur on vessels within its

3  cruise line brands, and Carnival failed in these roles by sailing the Vessel without a

4  properly enforced and implemented muster and evacuation policy, and this failure

5  caused confusion, injury and damage to the crew and passengers of the Vessel, during

6  the evacuation.

7      4.34   Carnival's liability across its brands for involvement at an operational

8  level is further supported by its own structure.  Carnival operates itself as a "dual

9  listed company" ("DLC") with Carnival plc, known collectively as "Carnival and

10  plc."[1]  The close relationship between the owners of all the Carnival cruise line brands

11  evinces the level of control and operation that Carnival exerts across all its cruise line

12  brands. Carnival is not merely a holding company.

13      4.35   This tragedy clearly was not an event that occurs absent negligence.  The

14  error that led to this tragedy was directly related to a culture shaped by Carnival, from

15  the development of policies, to their implementation, and enforcement through

16  ongoing assessment.  The tragedy likewise  resulted from Carnival's failure to ensure

17  the proper implementation of its safety management system, which it imposes on its

---

[1] Carnival operates as a "dual listed company" (a "DLC"), together with Carnival plc, incorporated in England and Wales (Carnival plc is not a defendant in this lawsuit).  According to Carnival's own 10-K for 2011, the "two companies operate as if they are a single economic enterprise with a single senior executive management team and identical Boards of Directors, but each has retained its separate legal identity." Ex. 8, at p.4, Item 1.  Business, A. Overview, I. Summary.  The assets and liabilities of one are effectively the assets and liabilities of the other.  *Id.* at p.F-8 to F-9, in particular, Note 3 – DLC Arrangement ("Under the terms of the DLC transaction documents, Carnival Corporation and Carnival plc are permitted to transfer assets between the companies, make loans to or investments in each other and otherwise enter into intercompany transactions. The companies have entered into some of these types of transactions and may enter into additional transactions in the future to take advantage of the flexibility provided by the DLC arrangement, and to operate both companies as a single unified economic enterprise in the most effective manner. In addition, under the terms of the Equalization and Governance Agreement and the deeds of guarantee, the cash flow and assets of one company are required to be used to pay the obligations of the other company, if necessary.  Given our DLC arrangement, we believe that providing separate financial statements for each of Carnival Corporation and Carnival plc would not present a true and fair view of the economic realities of their operations.  Accordingly, separate financial statements for both Carnival Corporation and Carnival plc have not been presented.") (emphasis added).

subsidiaries, including Costa Crociere. Most certainly, the tragedy was not caused by any voluntary action or contribution by the Plaintiffs. As such, Carnival is liable to Plaintiffs under the doctrine of *res ipsa loquitur*.

4.36    Defendant is being sued for its independent acts of wrongdoing, breaches of duty and negligent acts, all of which caused and contributed to this tragedy, the loss of life by some, and the injuries of hundreds more, including Plaintiffs.

## V.  CAUSES OF ACTION
## NEGLIGENCE

5.1    The foregoing paragraphs are re-alleged as though fully again set forth.

5.2    Plaintiffs' injuries were caused by the negligence of Carnival, which assumed a duty of care to the passengers of the Vessel by creating, mandating and actively enforcing the safety policies and procedures across its brands, including Costa Crociere.

5.3    Carnival furthermore assumed a duty ultimately to determine the methods and manner of the training of the officers and crew of the vessels sailing under its various cruise line brands, and further assumed a duty to create and enforce training standards imposed upon the officers and crew of the Vessel.

5.4    Carnival breached its duty of care by failing to impose upon its brands, including Costa Crociere, adequate safety policies and procedures, including a BRM Policy.

5.5    Carnival undertook in 2009 to draft a Bridge Resource Management Manual as part of a larger Bridge Resource Management Policy, but failed to mandate and enforce its adoption through its brands, including Costa Crociere, as it did with other specific policies and procedures. The failure of Carnival to mandate the adoption and implementation of the Bridge Resource Management Policy that existed well before this tragedy was a significant causative factor of the tragedy, in addition to a lack of adequate training.

5.6     Defendant knew, or should have known, of the risk of harm to Plaintiffs by allowing Plaintiffs to sail on a Vessel without this revised but unimplemented BRM Policy, as well as with other inadequate safety policies and procedures. This lack of adequate safety policies and procedures, including a revised BRM Policy that had been developed but not implemented, was the proximate and producing cause of injury to Plaintiffs.

5.7     Carnival is further liable for the negligent operation of the Vessel, among other things it specifically assumed a duty to do, and was ultimately responsible for, the training and assessment of the officers and crew of the Vessel.  The BRM Policy that Carnival failed to implement prior to the subject cruise, contained training requirements applicable to all deck officers and operating lines, including the crew of the Vessel.  The failure of Carnival to mandate the adoption and implementation of the BRM Policy was a failure to ensure the crew of the Vessel was adequately trained.

5.8     Carnival is further liable for its negligent operation of the Vessel and specifically assumed a duty by creating and promulgating numerous safety standards that were applicable to all of its cruise ship lines and its vessels, including Costa Crociere and the Vessel.  Such standards included, but were not limited to, the BRM Policy, which was drafted before this tragedy, but not implemented.  Carnival was directly and closely involved in setting policies applicable to its brands, including the policies directly related to the cause of the *Concordia* tragedy and Plaintiffs' injuries.

5.9     Alternatively, Carnival was negligent as operator of the Vessel, which negligence caused the injuries of Plaintiffs herein.

5.10    As a result of Defendants' breaches of duty, Plaintiffs were injured, and suffered the damages here alleged.

## VI.  GROSS NEGLIGENCE

6.1     The foregoing paragraphs are re-alleged as though fully again set forth.

6.2    Allowing Plaintiffs to sail on a vessel with wholly inadequate safety policies and procedures in place, including a BRM Policy that had been previously proposed but not implemented, exposed Plaintiffs to extreme hazards and harm.

6.3    Carnival proceeded with knowledge or conscious indifference that its failure to implement adequate safety policies and procedures, including a BRM Policy, could result in injury and/or death to passengers of the Vessel, including Plaintiffs.  Despite that knowledge, and the understanding a high likelihood existed that injury or death would  result from its acts or failures to act, Carnival proceeded in disregard of its knowledge, and subjected Plaintiffs to the dangerous conditions which resulted from these acts and failures to act.  Carnival's actions in this regard amount to wanton, willful, and outrageous conduct.  Carnival continued such wanton, willful and outrageous conduct after the tragedy as well, by negligently and grossly negligently, with conscious indifference, failing to enforce their promulgated specific safety standards and procedures, thereby placing at extreme risk of harm their passengers and crew, which conduct must be deterred, and may only be deterred, by the imposition of punitive damages.  Accordingly, Carnival is liable for gross negligence and punitive damages.

## VII. *RES IPSA LOQUITUR*

7.1    Carnival is liable to Plaintiffs under the doctrine of *res ipsa loquitur* by virtue of its exclusive control and management of the Vessel at the time of the accident.

7.2    The error that led to this tragedy was directly related to a culture shaped by Carnival, from the development of policies, to their implementation, and enforcement through ongoing assessment.  The tragedy likewise  resulted from Carnival's failure to ensure the proper implementation of its safety management system, which it imposes on its subsidiaries, including Costa Crociere.  Most certainly, the tragedy was not caused by any voluntary action or contribution by the

Plaintiffs.   As such, Carnival is liable to Plaintiffs under the doctrine of *res ipsa loquitur*.

## VIII.  DAMAGES

8.1     As a direct and proximate result of Defendants' conduct, including negligence and gross negligence, Plaintiffs suffered the following injuries and resultant damages, including, but not limited to: (a) mental anguish in the past; (b) lost earnings; (c) physical pain and suffering; (d) conduct entitling them to punitive and moral damages; (e) all such other and further damages as allowed by law.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that judgment be entered in their favor in the amount of at least $10,000,000, and punitive damages as determined by the finder of fact in this case, as against the Defendant, representing their actual damages in an amount exceeding the jurisdictional limits of this Court, together with prejudgment and postjudgment interest, excluding from this sum any amounts for their claim for punitive damages, which they leave to the discretion of this Court, guided by its conscience, attorney's fees, and costs of suit, and for all such other and further relief to which they may show themselves justly entitled, in law and equity.


DATED:   January 10, 2014.          Respectfully submitted,

                                     **SPAGNOLETTI & CO.**

                                     */s/ David S. Toy*
                                     David S. Toy
                                     Attorneys for Plaintiffs, Patricia
                                     Sandoval and Nicholas Taliaferro

**OF COUNSEL**:

SPAGNOLETTI & CO.
Francis I. Spagnoletti (admitted *pro hac vice*)
Email: fspagnoletti@spaglaw.com
Marc E. Kutner (admitted *pro hac vice*)
Email: mkutner@spaglaw.com

1  BAKER, KEENER & NAHRA, LLP
   Robert C. Baker
2  633 West Fifth Street, 54th Floor
   Los Angeles, CA 90071
3  Email: rbaker@bknlawyers.com

4  EAVES LAW FIRM
   John Arthur Eaves, Jr.
5  101 North State Street
   Jackson, MS 39201-2811
6  Telephone:  601 355 7961
   Email:  johnjr@eaveslaw.com

7

8                        **CERTIFICATE OF SERVICE**

9  I HEREBY CERTIFY that service of the foregoing was made in accordance with
   the Federal Rules of Civil Procedure on this 10th day January, 2014.
10

11                              */s/ David S. Toy*
                                David S. Toy
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28